## Hacker Estate

*Harold R. Wruble*, for executor.

*Henry Thalenfeld*, for Commonwealth.

SELECKY, P. J., October 3, 1959.—This is an appeal taken by the executor of the estate of Joseph Hacker, deceased, from an appraisal by the Inheritance Tax Department of the Commonwealth of Pennsylvania of certain real estate in said estate, as well as an appeal from the refusal of the register of wills to allow a credit for a loan, allegedly made by the sons of decedent to decedent during his lifetime, as a debt of decedent.

The testimony reveals that decedent owned property at 151 and 153 East Main Street in the Borough of Plymouth, which the Inheritance Tax Department appraised at $28,000, and which the executor maintains should be valued at $25,000. As testified by Robert L. Casper, a qualified realtor called by the executor, "This is an unusual property," in that No. 151 East Main Street, Plymouth, is only one-half of a large supermarket, with no wall separating it from 153 East Main Street, owned by decedent's sons, who

operated a supermarket grocery store in both properties, and the other parcel, 153 East Main Street, Plymouth, is a separate building, but dependent upon 149 East Main Street for its heat, so that both 151 and 153 East Main Street depend heavily upon 149 East Main Street for their proper usage, but 149 East Main is not in decedent's estate. The result is that the part owned by decedent could be used only in connection with the part owned by others, decedent's sons, and for that reason its value was lower because it could not be independently sold at the time of decedent's death, without requiring much alteration.

The testimony indicated that decedent and his sons apparently jointly built a one-story supermarket known as 149-151 East Main Street in Plymouth, in such maner that it was one joint building with no wall between them, although one-half, 149 East Main, was owned by the sons and 151 East Main by this decedent. The common heating, plumbing, airconditioning and the like, proceeding from 149 East Main, makes the estate half of the building, 151 East Main Street, so heavily dependent upon 149 East Main Street, that it substantially reduces the marketability, and hence the value of the estate half, 151 East Main. Decedent also owned the property adjoining to the north, 153 East Main Street, which is a two-story building, with two apartments on the second floor, but the first floor was made a part of the supermarket, with entrance through 151 East Main Street, so that 153 East Main Street is not a separate building that can be separated very easily from the supermarket, from which it receives its heat and other utilities.

The testimony revealed that although some $59,000 was spent in remodeling these buildings, this was made necessary because of the extra expense of shoring the walls of adjoining buildings, and doing other matters to old buildings that were more expensive than razing

the buildings completely and building new ones. Executor's real estate broker testified that the cost of remodeling an old building is not necessarily indicative of the value thereof. The testimony was that the net income from these properties in the estate would bring a gross dividend of eight percent on an investment of $25,000, which the broker stated was less than the market demanded for multi-unit buildings, such as this, which had not only the store, or at least part of the store, but two apartments which had to be serviced. The real estate broker indicated that, at the figure of $28,000, at which the property was appraised by the Inheritance Tax Department, the net income would be less than seven percent, which is much less than purchasers of this type of property would demand before purchasing this type of investment property, with multiple units requiring separate servicing.

Taking into consideration the type of testimony adduced before the court, the fact that the property is not salable because one end is an open property adjoining another property not owned by decedent at the time of his death, and the special use to which the property was put, the court finds that the appraisal of $28,000 placed on it by the inheritance tax office was too high and will reduce it accordingly to the sum of $25,000 for inheritance tax purposes, thus sustaining the executor's appeal from their appraisal.

The testimony further indicated that decedent became seriously ill for several months before he died, and that instead of decedent paying his own bills, the sons advanced him funds therefor, and produced in evidence checks from the partnership grocery business signed by his two sons, Morris and Oscar Hacker, showing that their partnership funds were being used as advances for various medical and other bills of decedent. Although this was claimed to be $4,800 at

first, the executor stipulated that the following. bills were paid by the sons on behalf of decedent, including only one-half of the debts paid from the benefit of entireties properties owned by decedent and his surviving wife.

| | |
|---|---:|
| Taxes 1957 $1,373.41 less $215.53 (on other property) | $1,157.88 |
| Taxes 1958 $1,351.98 less $212.14 (on other property) | $1,139.84 |
| Stanley Miskiewicz 236-238 E. Main St., ½ of $122.60 | $ 61.30 |
| Harold Wruble, Atty. services | $ 25.00 |
| Thomas J. Nauss, M.D., medical services | $ 100.00 |
| Julian Long, M.D. | $ 17.00 |
| Julian Long, M.D. | $ 53.00 |
| J. B. Post—Paid by check $85.11 | $ 73.60 |
| C. Elmer Luft 236-238 E. Main St., ½ of $20.35 | $ 10.18 |
| Julian Long, M.D. | $ 32.00 |
| Venetian Blind Co. 236-238 E. Main St., ½ of $4.00 | $ 2.00 |
| Pomeroy Co. | $ 3.00 |
| Cecelia Dragon, R.N., nursing service | $ 24.00 |
| Jane Thomas, R.N., nursing service | $ 12.00 |
| | $2,710.80 |

There was further testimony that just a few days before decedent's death certain stock owned by decedent and his wife, as tenants by entireties, was cashed for the repayment of this loan, but by the time the check was issued, decedent had died so that the check was issued to the survivor, his widow, who then advanced her own funds to repay this loan (after her husband's death), and who is now asking for reimbursement from the estate. Whether the loan was repaid by the widow who now asked for reimbursement, or whether the loan was to be paid by the estate

to the sons, makes little difference in the matter as to whether there was an actual debt owed by decedent to the sons. This court finds from the checks in evidence that the debt was owed by decedent to his sons at the time of his death, for advances made by them, which were not gifts, in the stipulated amount of $2,710.80, and directs that credit be given for said loan by the register of wills for the inheritance tax purposes. See Drehmann Estate, 66 Montg. 240 (1950), and Frey Estate, 4 Fiduc. Rep. 574.